NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1285
_____

UNITED STATES OF AMERICA

v.

RICHARD J. HARLEY,
                              Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(M.D. Pa. No. 3-12-cr-00224-001)
Honorable A. Richard Caputo, District Judge

_____

Submitted under Third Circuit LAR 34.1(a)
February 7, 2017

BEFORE:  MCKEE, COWEN, and FUENTES, <u>Circuit</u> <u>Judges</u>

(Filed: April 14, 2017)
_____

OPINION[*]
_____

COWEN, <u>Circuit</u> <u>Judge</u>.


        Richard J. Harley appeals from the criminal judgment and the order denying his

_____

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

post-trial motions entered by the United States District Court for the Middle District of Pennsylvania. We will affirm.

## I.

Harley was charged with fifteen counts of wire fraud in violation of 18 U.S.C. § 1343, one count of bank fraud in violation of 18 U.S.C. § 1344, two counts of bankruptcy fraud in violation of 18 U.S.C. § 157(1), and five counts of making false statements in bankruptcy filings in violation of 18 U.S.C. § 152(3). He filed a motion to suppress evidence seized from his home and statements obtained in the course of the seizure. After conducting an evidentiary hearing, the District Court denied Harley's motion. See United States v. Harley, No. 3:12-CR-224, 2014 WL 1405145 (M.D. Pa. Jan. 27, 2014).

The jury returned a guilty verdict against Harley on all counts. The District Court sentenced him to a total of 144 months of imprisonment on each of the wire and bank fraud counts and 60 months' imprisonment on each of the bankruptcy-related charges (all to run concurrently). Harley was also sentenced to serve three years of supervised release and to pay $323,800.00 in restitution. Harley moved for a judgment of acquittal or a new trial. He also filed a pro se motion to dismiss the indictment. Both motions were denied. See United States v. Harley, NO. 12-CR-224, 2016 WL 374456 (M.D. Pa. Feb. 1, 2016).

## II.

Initially, Harley challenges the sufficiency of the evidence. The twenty-two counts implicated three schemes: (1) a scheme by Harley to defraud individuals and financial institutions by claiming that his company, RJH & Company ("RJH"), owned

over one billion dollars in Texas oil in order to solicit loans and investments; (2) a scheme in which he falsely claimed that RJH owned Federal Reserve Bank instruments totaling more than a billion dollars and solicited financial and lending institutions to negotiate, deposit, manage, and loan money against these funds; and (3) a scheme in which he attempted to defraud creditors by filing false and fraudulent bankruptcy petitions. Considering the evidence in a light most favorable to the verdict, we agree with the District Court that a reasonable jury could have found the contested elements beyond a reasonable doubt.[1] See, e.g., United States v. Wise, 515 F.3d 207, 214 (3d Cir. 2008).

We begin with the oil scheme. There was sufficient evidence to establish beyond a reasonable doubt that Harley knew the Texas oil investment was fraudulent and that he willfully intended to defraud others. "First, the Government accurately points out that Harley's claim that he owned over one billion dollars ($1,000,000,000.00) of oil located in Texas is sufficiently incredulous that any reasonable juror could have disbelieved it." Harley, 2016 WL 374456, at *2. Even the lowest valuation ($250 million) is absurdly high, especially given Harley's failure to explain to FBI Special Agent Vincent Browning the consideration he gave to obtain a purported $200 million note from Enpetro. "In light of this evidence that Harley never called his two hundred million dollar ($200,000,000.00) note due despite having no source of income besides five hundred and thirty-five dollars ($535.00) per month in Social Security income, the jury could have

---

[1] The District Court possessed subject matter jurisdiction pursuant to 18 U.S.C. § 3231, and we have appellate jurisdiction under 28 U.S.C. §1291.

reasonably inferred that Harley knew that his note and collateral were worthless." Id. As the District Court recognized, Harley purportedly had his own reasons for not cashing the note (i.e., he did not believe that Enpetro had the money to pay it and preferred to borrow against its value), but the jury was free to reject this explanation. In addition, David Kesterson (an oil geologist) testified that, even though there had been no oil production since 1993, "Harley falsely told him that the wells were in production as of 1999." Id. at *3 (citing A1316). According to Harley, the record included "reports from Kesterson that there was as much as $1,000,000,000.00 in oil reserves in the property involved." (Appellant's Brief at 16 (citing A2376-A2468).) Yet the FBI found documents in Harley's home indicating that he had been researching prior fraudulent schemes involving the use of bogus assets. Explaining how the evidence showed that Harley intended to defraud his victims, the District Court observed that Harley, although he obtained money from his victims for use as investments, spent the funds for his own personal benefit. He also lied about his wealth and background.

We likewise agree with the District Court that there was sufficient evidence to support the bank fraud conviction as well as the wire fraud convictions arising out of Harley's Federal Reserve scheme. According to Harley, "the only evidence of what Harley truly believed about [the Federal Reserve checks] came from the testimony of Edward Siegel of State Street Bank and Richard Jones of the Federal Reserve Bank," who both testified that Harley "believed that the Federal Reserve checks were legitimate business opportunities." (Appellant's Brief at 14 (citing A149-A157, A402).) However, the government presented evidence indicating that Harley was told on numerous

4

occasions that the checks and associated documents were bogus. Furthermore, Browning found a number of incriminating documents in Harley's residence. For example, he had a printout from the Federal Reserve Bank of New York, which advised the public of the fraudulent nature of this check scam.

Harley asserts that the two RJH bankruptcy petitions did not constitute substantial evidence of fraudulent intent because he had a constitutional and statutory right to file these petitions and that, with respect to the allegedly false statements set forth in his bankruptcy filings, the record contained no evidence that they were anything other than mistakes by a layperson acting without the benefit of counsel. As the District Court explained, there was sufficient evidence from which a reasonable juror could find beyond a reasonable doubt that the two RJH petitions were filed in order to defraud Marshall Silverstein (one of Harley's victims). The 2010 petition was filed shortly before a scheduled pre-trial conference on Silverstein's request for sanctions and entry of a judgment on account of Harley's refusal to appear for depositions. The conference was cancelled, and the bankruptcy case was dismissed for failure to pay the filing fee. Similarly, the 2011 petition was filed a day before the rescheduled sanctions hearing, the hearing was cancelled, "Harley testified under oath [in the bankruptcy proceeding] that one of the reasons he filed the second bankruptcy petition was to prevent the hearing," and the bankruptcy petition was dismissed. Id. at *5 (citing A522). With respect to the false statement charges, we note that, in light of our assessment of the oil scheme, there was sufficient evidence to establish that Harley did not commit a simple mistake when he falsely stated that RJH had assets totaling $765 million (including ten million barrels of

5

proven reserves).  The evidence also indicated that Harley was well aware of judgments entered in favor of Silverstein, the United States, and the Securities and Exchange Commission (for instance, Harley had listed Silverstein as a creditor in the 2011 petition). Yet he failed to identify these creditors in his 2012 personal bankruptcy petition.  Finally, Harley failed to acknowledge that he was an officer of RJH (even though he "repeatedly told his victims that he was the Chief Executive Officer of RJH and signed all of his correspondence using that title, including his prior corporate bankruptcy petitions," id. at *6), and failed to list all of his personal property (including several bank accounts).

In addition to challenging the sufficiency of the evidence, Harley argues that the District Court should have granted him a new trial because evidence of his prior involvement with the criminal justice system was presented to the jury.  "Specifically, during the testimony of Karen Musloski, Government Ex. 20.6E was displayed to the jury, which reflects a 'criminal' docket number for the monetary judgment that Musloski was testifying about."  Id.  No objection was made at the time, and the parties agreed to redact the word "criminal" before the document went to the jury (and, although the District Court indicated it would give a curative instruction, the defense declined).  Under these circumstances, the District Court did not commit any reversible error.  See, e.g., United States v. Vazquez, 271 F.3d 93, 99 (3d Cir. 2001) (stating that, under plain error standard of review, there must be error and that error must be plain, affect substantial rights, and seriously affect fairness, integrity, or public reputation of judicial proceedings).  As the District Court aptly noted, this Court has held that more serious disclosures than a brief display of a document with a criminal docket number were

6

harmless.  See, e.g., United States v. Self, 681 F.3d 190, 199 (3d Cir. 2012) (testimony indicating that defendant was "already in jail"); United States v. Greenstein, 322 F. App'x 259, 264-65 (3d Cir. 2009) (not precedential) (use of terms "police photo" and "weapons violation").

The District Court appropriately disposed of Harley's motion to suppress.[2]  Noting that a failure to provide a copy of the warrant at the time of the search does not constitute grounds for suppression unless the defendant demonstrates legal prejudice or bad faith, Harley asserts that the District Court failed to make any findings with respect to prejudice or bad faith.  See, e.g., Harley, 2014 WL 1405145, at *2 ("Absent a demonstration of prejudice or bad faith—neither of which is present here—suppression of evidence is not the proper remedy for a violation of [Federal Rule of Criminal Procedure] 41." (quoting United States v. Lipford, 203 F.3d 259, 270 (4th Cir. 2000))).  He also takes the District Court to task for purportedly failing to apply several factors to resolve the dispute as to whether a search warrant had in fact been issued before the search occurred.  See, e.g., id. at *1 (identifying indicia to be considered in determining whether warrant was issued in absence of signature).  During the suppression hearing, the government submitted a search warrant—signed, dated, and filed (and assigned a case number) by the Magistrate Judge two days before Harley's home was searched.  In addition, Harley does not point to any evidence of prejudice or bad faith.  See, e.g., United States v. Hall, 505 F.2d 961, 964 (3d Cir. 1974).

---

[2] We review the District Court's denial of a suppression motion for clear error as to the factual findings, while exercising plenary review as to legal issues.  See, e.g., United States v. Silveus, 542 F.3d 993, 999 (3d Cir. 2008).

Finally, Harley filed a pro se motion to dismiss the indictment and set aside the verdict, claiming that the government introduced perjured testimony.[3] Specifically, "Stanley Dedmond, the owner of Enpetro testified [before the grand jury] that he never sent an original of the promissory note to anyone," while "William Trantham, an attorney for Enpetro who signed the promissory note testified that the original note was not sent to Harley." (Appellant's Brief at 25 (citing A14).) Harley claims that Dedmond made a statement to the FBI indicating that he sent the note to Harley, and Browning "found more than one original Enpetro note during the search." (Id. at 25-26 (citing A23-A77, A1115-A1172.) "[E]ven assuming that they were false statements, there is no indication of how any of these statements 'substantially influenced the grand jury's decision to indict,' nor did these statements create 'grave doubt' that the grand jury's decision to indict was free from the substantial influence of the purportedly perjured testimony." Harley, 2016 WL 374456, at *9 (quoting Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988)).

### III.

We will affirm the judgment of the District Court as well as its order denying Harley's post-trial motions.

---

[3] We review a district court's factual findings with respect to a motion to dismiss an indictment for clear error, while its legal conclusions are subject to plenary review. See, e.g., United States v. Bergrin, 650 F.3d 257, 264 (3d Cir. 2011).